"Know all men by these presents, that on the first day of May, in the year of our Lord one thousand eight hundred and twenty-one, I, John Allison, of the town of Hillsborough, county of Orange, and State of North Carolina, of the one part, Frederic Nash, Abner B. Bruce, and David Yarbrough, of the town, county, and State aforesaid, and William Shaw, of the county of Wake and city of Raleigh, of the other part, witnesseth, that for and in consideration of the natural love and affection which he, the said John Allison, hath and beareth to his friends and relations in North Britain, in the shire of Renfrue, and to the intent to make some provision for their maintenance and advancement in the world, and for settling and assuring the premises hereinafter mentioned, and for other good causes and considerations me hereunto (142) moving, I, the said John Allison, from a full confidence I have in the honor, honesty, and integrity of them, the said Frederic Nash, Abner B. Bruce, David Yarbrough, and William Shaw as aforesaid, and for the consideration of the sum of five shillings to me in hand paid by them, the said Frederic Nash, Abner B. Bruce, David Yarbrough, and William Shaw as aforesaid, that is to say, in trust the following property, towit: my corner house now occupied by John Van Hook Co., also my new house lately occupied by William Huntington Co., both being on part of Lot No. 6 in the town of Hillsborough, be sold, separate or together, as may best suit the purchaser and enhance the price; also all my stock *Page 64 
I now have and possess in the State Bank of North Carolina at Raleigh, that is to say, if I do not sell said stock before my decease, consisting of twenty shares, amounting to $2,000, together with all the profits or emoluments that may be due thereon; I, the said John Allison, do hereby assign over and convey to them, my trustees, for the following purposes hereinafter mentioned, towit: that immediately after my decease, or as soon after as may be found convenient, I, the said John Allison, do hereby authorize my trustees aforesaid to sell my bank stock as aforesaid for the best price that can be got for it, and convey or transfer the same to the purchaser or purchasers thereof and to their heirs and assigns forever, and to do and transact all matters and things touching and concerning the premises agreeably to the laws and regulations that now are or may hereafter be established or required by the directors of said bank touching and concerning the premises, in trust and confidence that immediately after my decease, or as soon afterwards as may be found convenient, they, the said trustees aforesaid, are hereby required, empowered, and authorized to sell the corner house now occupied by John Van Hook Co., also my new house lately occupied by William Huntington Co., with the appendages thereunto belonging, (143) described as aforesaid, for the best price that may be got for them, and to convey to the purchaser or purchasers thereof, their heirs and assigns forever, as fully to all intents and purposes as I myself might or could do were I living: Provided, always, that as soon as the money is received arising from the sale of my stock I have in the State Bank, so soon as the money shall be collected, shall be remitted by bills of exchange or otherwise, as my trustees may deem proper for the safe conveyance, and the bills to be drawn in favor of and made payable to James Craig, junior, manufacturer, in the town of Paisley, shire of Renfrue, North Britain; and further, my trustees are hereby required and directed that out of the moneys arising from the sale of my houses and lots as aforesaid $250 be paid to my nephew, James Allison, and $100 to Abner B. Bruce, for the purposes mentioned in my will; and $50 to Mary Allison, mother of James Allison, of the State of Delaware (if living at my death); and my said trustees are hereby directed that all the debts due to the said John Allison at his decease, either by note, bond, house rent, money on hand or otherwise, they, my said trustees, are hereby empowered to collect, sue for, and receive the same into their own hands, and also be placed with the money arising from the sale of my lots and houses and bank stock, and the balance of what may remain in their hands, after what I have hereby enjoined on them to perform, I do hereby require and direct to be remitted to the said James Craig, junior, manufacturer, in the town of Paisley, North Britain, shire of Renfrue; and the said trustees are hereby authorized and directed to *Page 65 
retain to their own use out of the moneys that may come to their hands a sufficient compensation for their trouble in performing and executing the trust hereby reposed in them, and also for discharging any debt that may arise from a sick or death bed, and physician's aid, if required, and funeral charges, etc. And I do hereby request of my trustees nothing but a plain and decent interment, and that no funeral (144) service shall be performed at my interment, but what a Gospel minister or private Christian may think fit and appropriate for such a solemn occasion. And this deed of trust shall not affect my last will and testament in favor of my nephew, James Allison.
"I hereby request Mr. William Shaw, of, Raleigh, who I have appointed one of my trustees, that immediately after my decease, or as soon after as he may find it convenient, to write to Mr. James Craig, acquainting him of my decease; and I do direct that neither my stock nor my houses and lots in Hillsborough shall be sold until an answer be received from him. And in case of the death, inability, or removal of any of the trustees hereby nominated and appointed by me to act in this behalf, then and in that case the surviving and acting trustees are hereby required and directed to choose another or others in their stead; and shall have full power from time to time to act accordingly as the case may require. And it is hereby required by him, the said John Allison, that this deed of trust be put on record as soon as practicable after my decease. In testimony whereof I, the said John Allison, do hereunto set my hand and affix my seal, the day and year first above written."
Afterwards, on the same day, John Allison executed another paper-writing in the presence of the same subscribing witnesses, with the solemnities required by law in a will to pass real estate, and in it referred to the former writing; this last writing was in these words:
"In the name of God, Amen! I, John Allison, of the town of Hillsborough, county of Orange, and State of North Carolina, being well advanced in years and very infirm, but of sound, disposing mind and memory, and calling to mind the mortality of my body, do make, ordain, and publish this my last will and testament in manner and form following, towit, after all my just debts and funeral charges are paid by my trustees appointed for that and other purposes, I give, devise, (145) and bequeath to my nephew James Allison all the personal property I may be possessed of at the time of my death not otherwise disposed of, in addition to the sum of $250 to be paid to him by my trustees, to him, his heirs and assigns forever, except my stock in the State Bank at Raleigh, consisting of $2,000, and the dividends that are or may become due thereon, also excepting my house rents and debts of every description which I have made over to certain trustees for other purposes, which will more fully appear by reference to the deed of trust bearing *Page 66 
even date herewith, and excepting also my negro woman slave named Ann, which for divers causes and considerations me hereunto moving and meritorious services rendered to me by her in time of sickness, I do hereby will, devise, and bequeath my said negro woman slave Ann to Abner B. Bruce, with this condition, that she be not sold or given away to any other person except it be with her consent; but that the said Abner B. Bruce support her with food and clothing suitable to her station; and I do hereby given, devise, and bequeath to the said Abner B. Bruce the sum of $100, which sum I hereby direct my said trustees to pay to him for the support of my said negro woman Ann when she may, through old age or infirmities, become unable to perform the duties of a slave and servant; and should my said negro woman die, or be dead before or after my decease, the said sum of $100, notwithstanding, is to be paid to the said Abner B. Bruce as a legacy out of the real property I have made over to my trustees and directed to be paid to him by them.
"All my just debts, if any be due and owing to any person or persons whatever after my decease, I hereby direct to be paid by my trustees nominated for that and other purposes, who are also authorized (146) to collect all debts due and owing to me, whether due by bond, note, account, or in any other manner on what account soever.
"It is hereby declared to be understood, and my will and intention is, that my nephew James Allison shall have no claim, right, or title whatever to any bonds, notes, debts, dues, or accounts that may be due or owing to me on any account whatever at my decease. I, the said John Allison, do hereby nominate, constitute, and appoint my friends David Yarbrough and Thomas Clancy, esquires, executors to this my last will and testament, hereby revoking, annulling, and disallowing all former wills and bequests by me heretofore made, hereby allowing, ratifying, and confirming this only to be my last will and testament. In testimony whereof I, the said John Allison, do hereby pronounce, publish, and declare, in the presence of God as my witness, and by my well known signature written with my own hand and seal thereto affixed, this first day of May, in the year of our Lord one thousand eight hundred and twenty-one."
John Allison died without revoking or altering the foregoing writings, and they were offered for probate as containing one testamentary disposition of the estate of John Allison; prior to which, David Yarbrough, the subscribing witness, who is the same person mentioned by that name as a trustee in the paper-writing first set forth, by deed, fully released to the other trustees all the interest which he had under the writings, and was admitted as a witness, though objected to. *Page 67 
The probate was opposed, and on an issue submitted to a jury, they found that the two papers above set forth were the last will and testament of John Allison, subject to the opinion of the court upon the foregoing facts; and it was submitted to the court to say whether the two paper-writings together constitute one testamentary disposition or will.
The court (Paxton, J.) held that the paper-writing constituted one will, and rendered judgment accordingly, from which an appeal was taken to this Court.
It may be satisfactorily inferred from the cases (171) cited that any writing by which the intention of the party to dispose of his estate after his death appears will amount to a devise, provided such intention be consonant to the rules of law and the writing have the formalities required by the act. It is of no moment whether the testator would have called the instrument a deed or a will. The true inquiry is, How will it operate? and if the provisions in it are testamentary, it must operate as a will. The difference between a deed and a will is this: the former must take place upon its execution, or never; not by passing an immediate interest in possession, for that is not essential; but it must operate as passing that interest when the deed is executed. Thus, where a father covenants to stand seized to the use of his son, reserving a life estate to himself, the deed takes effect at once, by passing an interest to the son. But a will can only operate after death. Does this instrument convey to the trustees any power or capacity of acting till after the testator's death? It assigns over and conveys to the trustees, what? Not any property, but "that immediately after his decease, or as soon thereafter as may be found convenient," he authorizes them to sell his bank stock and real estate, and apply the proceeds in the manner he directs. They are not authorized to take a single step in the business of his estate till after his death; nor does he part with or impair his dominion and control over the property while he lives; indeed, it is a plain manifestation of what his intent was, that he directs the instrument to be recorded only after his death; and there is no reason to believe that he ever parted with the possession of it during his lifetime.
In Hixon v. Witham, 1 Ch. Ca., 248, the writing was in the form of an indenture, and used the terms "grant, bargain, and sell," yet it was decreed to be a good will. In Proude v. Green, 1 Mod., 117, articles of agreement which used the word "give," and were delivered as an act and deed, were held to be a will. The cases generally establish the position that whatever the instrument may be called by the party, (172) *Page 68 
or however it may be considered by him, if the intention upon the whole be that it shall not operate before his death, it is then testamentary. In addition to this, there is much weight in the reasoning that this paper is so plainly referred to and incorporated in the will as to become a part of it, although it had not been duly executed. But then it is indispensable that the will should be executed according to the directions of the act of 1784. This is the only part of the case in which I have entertained any doubt; but after much consideration my opinion is that it is not attested by two such witnesses as that act requires. If the act had merely required the will to be attested by two witnesses, the common law would have instructed us that their competence at the time of the proving the will would have been sufficient. The words which follow in the act, twowitnesses at least, no one of which shall be interested in the devise ofsaid lands, must be supposed to have been inserted for some purpose; and this could only be to refer to their competence at the time of attestation.
The preamble to this section of the act professes to guard against the undue influence of those about a testator in his last moments; and it must be a strong inducement to attempt the exercise of this influence if a witness is interested at the time of his attestation. The subsequent act of 1784 asserts that it was the design of this requisite of the attestation of witnesses to prevent fraud and imposition.
The statute of frauds required a will to be attested and subscribed in the presence of the devisor by three or four credible witnesses. Much difference of opinion existed whether this competence (for so the word was understood) should be referred to the time of the attestation or to that of proving the will; and I think it difficult to read the cases on this subject without a conviction that the weight of authority, as well (173) as reasoning, is in support of the former opinion. In one of the earliest cases to be met with on this question the testator disposed of his real estate by will, and gave to one J. H. and his wife 10l. each for mourning, with an annuity of 20l. to E. H., the wife of J. H. The will was attested by three witnesses, whereof J. H. was one. The legacies and satisfaction for the annuity were tendered and refused. The question upon the special verdict was whether or not the will was well attested according to the statute of frauds. The Court was unanimously of opinion that the right to devise lands was not a common-law right, but depended upon the powers given by the statutes, the particulars of which were that a will of lands should be in writing, signed and attested by three credible witnesses in the presence of the devisor; that these were checks to prevent men from being imposed upon; and certainly meant that the witnesses to a will (who are required to be credible) *Page 69 
should not be persons entitled to any benefit under that will. In answer to the objection that nothing vests till the death of the devisor, and, therefore, at the time of the attestation the witness has no interest, the Court said that he was then under the temptation to commit a fraud, and that is what the Parliament intended to guard against; that the true time for his credibility is the time of his attestation; otherwise, a subsequent infamy, which the testator knows nothing of, will avoid his will. Austey v.Dowsing, 2 Stra., 1254.
Lord Camden's opinion, though at variance with that of the judges who sat with him in Hindon v. Kersey, deserves much weight, not only from its cogent reasoning, but from the circumstance that the Legislature, within a few years after its delivery, adopted its policy and principles by destroying the interest of the subscribing witness, whatever it might be at the moment of attestation. This was by the act of 25 Geo. II., passed about thirty years before our act of 1784. The whole controversy must have been known to many members of the Legislature of that day, and I think they had the same policy in view, though they have pursued a different course to attain it. The question (174) to be asked on the will is whether the testator was in his senses when he made it, and that is the important moment when vigilance and caution are most necessary in the witnesses, and when their minds should be most free from any bias that might warp their judgment. In other cases, according to the opinion quoted, the witnesses were passive; here they wereactive, and in truth the principal parties to the transaction. The testator was instructed to their care. The design of the statute was to prevent wills from being made which ought not to have been made, and always operates silently by intestacy. It is true, the design of the statute was to prevent fraud, though no fraud appeared in that case, yet it prescribes a certain method which every one ought to pursue to prevent fraud. As to the minuteness of the interest, as there was no positive law which was able to define the quantity of interest which should have no influence upon men's minds, it was better to have the rule inflexible than to permit it to be bent by the discretion of the judge.
Under this construction of the act of Assembly, which, however reluctantly, since it disappoints the will of the testator, I think the true one, my opinion is that the witness was disqualified, since he and the other trustees were authorized to retain a sufficient compensation for their trouble. This gave them an interest in the devise of the lands, and would, upon common-law principles, render them incompetent to prove the will, as to the land. Though in England the office of executor who has no commissions or a legacy is a burthensome one, and never injurious but from mismanagement. *Page 70